I will move to the last case on the calendar, Oneida Indian Nation v. Phillips. Thank you very much, your honors. Your honor, may it please the court, my name is Joseph Membrino, attorney for appellants Melvin Phillips and the Phillips Trust. The district court nullified a 175-year-old real property title and dispossessed Phillips, a citizen of New York and a direct descendant of Oneida's signatories to the 1838 federal treaty and the 1842 state treaty from which he derives his title. The deed for his family's estate at 859 of the record documents the Phillips' unbroken intergenerational title and possession. The deed includes evidence in the form of ancient documents recognized under New York real property law. This court should reverse for four reasons. First, as a threshold matter, OIN's quiet title action is barred by the Supreme Court's City of Sherrill decision and this court's Post-Sherrill Trilogy. The Indian Latches Doctrine established by those cases precludes ancient claims by OIN  The district court erred by not applying Sherrill and the Sherrill Trilogy when it dismissed Phillips' counterclaim for quiet title and granted judgment on the pleadings to OIN. Essentially, the court concluded that the trilogy protects New York's non-Indian citizens but not its Indian citizens from dispossession. This court has made no such distinction. In Stockbridge-Munsee, the third case in the trilogy, this court protected the, quote, settled expectations of current landowners, unquote. Phillips is a current landowner. There is no reasonable basis on which to conclude that this court's decisions give more protection to non-Indian remote successors and interests whose titles rest on questionable 19th century conveyances than to Phillips, whose ancestors relied on the United States commitment in the Buffalo Creek Treaty that they could continue to live on the family estate forever if they chose to do so. They have lived that promise and held their title for generations without any claim by any Oneida tribal entity ever having been made until this action was filed against Phillips three years ago. Further, the district court erroneously attributed to Phillips an argument that the Indian Latches Doctrine transferred title to him. That is not correct. Phillips invoked the Indian Latches Doctrine as a shield against OIN's quiet title claim, not as a sword to establish his own title. Sherrill and this court's post-Sherrill decisions established limitations on OIN sovereignty and title in the historic Oneida reservation. The district court upended those limitations, not only for Phillips' settled expectations of quiet title, but also potentially for non-Indian land titles within the 104-acre Marble Hill tract that includes Phillips' land. Second, the district court failed to acknowledge that there are numerous material facts in dispute and erred by not construing the pleadings in the light most favorable to Phillips. The district court gave no weight to the plausible and compelling evidence set out in Phillips' recorded deed, the factual allegations in his affirmative defenses, or the historical and contemporary facts regarding Phillips' possession and title. Third, this court's 1920 decision in United States v. Boylan barred dispossession of individual Oneida descendants from their family estate, whose title also derived from the 1838 federal treaty and another 1842 state treaty. Boylan protected the property rights of specific individual descendants of Oneida Indians to a specific parcel of land. No tribal rights to land were at issue or found to exist in Boylan. The district court did not address Boylan, even though OIN's complaint erroneously relies on Boylan to support its claim of title against Phillips. Fourth, the district court erred in barring Phillips' counterclaim to quiet title on the basis of OIN's sovereign immunity by declining to consider the applicability of the immovable property exception to the common law of sovereign immunity on which tribal sovereign immunity is based. Nine years ago, in Oneida Indian Nation v. Madison County at 665 F. Third, this court followed up on its Madison County decision discussed in Phillips' reply brief. There, this court concluded that judicial estoppel ensured the permanence of OIN's voluntary sovereign immunity waiver that it had made to evade judicial review of its sovereign property in the historic Oneida reservation. Phillips is a beneficiary of that bar. Yet Phillips is here today because OIN has revived its claim of sovereign immunity to dispossess him. OIN's claim of sovereign immunity here would defeat the purpose of judicial estoppel, which is to protect the integrity of the judicial process. If it pleases the court, I will reserve the rest of the time and take your questions. Thank you very much. We'll begin with Judge Laurier. Good afternoon, Mr. Membrino, and thank you, Judge Cabanas. So you alluded to the, I think, the earlier Oneida case by our colleague, Judge Parker, um, which seemed to make it very clear that the 1838 Treaty did not disestablish the OIN reservation. Um, do you agree with that? Yes, with an explanation, Your Honor. This establishment of the reservation has nothing to do with Phillips' claim. The focus of the 1838 Treaty for Phillips' purpose is the special provisions for the Oneida in Article 13. That provision provided affirmatively for the protection of the land tenure of those non-emigrating Oneidas, such as Phillips' ancestors, to remain in New York secure in their title. So we do not need a finding by this court or an overriding of its earlier decisions on this, and in fact, the Supreme Court's decision in Sherrill to, regarding disestablishment. Okay. But you are arguing that the 1838 Treaty created individual rights to OIN land, is that right? Yes, the 1838 Treaty has two facets to it. It was with the Oneida Nation, among other New York Indian tribes. Its main purpose was to arrange for an exchange of lands in the West for a new home for the Oneidas there. And there was a very clear reaction by many Oneidas who did not want to remove. But it was there, as can be read in Article 4 of the Treaty, that the new home, sovereignty, self-governance of the Oneida Nation or the historic Oneida tribe would be. As to those Indians who did not want to remove, it's important, I think, to remember the history of the Treaty adoption, the Treaty ratification. It was pretty much wrapped up in early 1838. But when the federal government understood that there were Indians who were troubled about the meaning of the Treaty, they dispatched their Treaty Commissioner Gillette back to the Oneida people and explained to them what I had quoted or paraphrased a little earlier, that they should not have any concern about being forced to remove, but could remain where they were forever. And that's what they did. And that is what the Phillips family and his ancestors have done. They have implemented that provision of the Treaty. And that provision reflects some theory of some possibility of individual ownership, correct? In your view? Well, yes, I guess I'm not quite sure where that individual ownership goes. But yes, this is an individual family estate. And I think the Boylan case is very instructive on that point, because the Boylan case involved one of 19 lots, a portion of which four families out of the 264 or so population of Oneidas in the Christian Party owned as tenants in common. And so that was their property. And when the United States intervened on their behalf to undo the foreclosure and eviction, that title went to not the Oneida tribe. There was no Oneida tribe that was federally recognized at that time in the state of New York. It went to the property holders who held it as tenants in common. But you are pressing on this appeal, a theory of individual ownership, correct? Yes. And what the other side is saying, what the nation is saying is that you did not make this argument before the district court. Sure, I see what you're saying. We did. What Melvin Phillips, the key element of this case, Your Honor, in our view is Melvin Phillips' deed. Melvin Phillips' deed is a deed to his family estate. The Orchard Party lands encompassed a total of four lots. It's described currently at over 104 acres. Mr. Mambrino, whatever argument you're about to make relating to individual ownership, my question is actually, where could I look in this record to see that you made this argument before the district court? In our counterclaim, in our papers, when Melvin Phillips is described- When you say your counterclaim, did you make the argument as opposed to just depositing it in the fact of individual ownership in a counterclaim? Well, it's hard to answer that question, Your Honor. What we did was defend a deed. This is a real property action. It was not a sovereignty question. It was not a claim on behalf of other Orchard Party people. What it was was a claim that Mr. Phillips, as a steward of his family's legacy and his determination to preserve the land of his family estate for all future descendants of those who were descendants of the Orchard Party, treated that they would be able to enjoy that land. That's what his trust is for. It is not based on a claim of sovereignty. It is based on his family's legacy that is documented- I'm not sure you've answered my question about where to look, but okay. So you're making the argument there. Okay, thank you. And just a few more questions and then I'll leave you. So the 1838 treaty to which you alluded approved arrangements made with the governor. Is that correct? Yes, what we consider the 1838 treaty to be a pre-approval, a delegation to the Orchard Party and Christian parties by means of Article 13 to make their satisfactory arrangements on the understanding that many of them were not going to emigrate to the lands promised in the 1838 treaty in the West. So you think that we should read that grant as constituting a pre-approval, as you put it, of the Orchard Party ownership as effectuated in the 1842 treaty a few years later, right? I didn't quite hear that, but I think I understood it and will say yes. You can always be careful, you know, about doing that. I'll ask you to repeat the question, your honor. Your view, you think that we should read the limited grant under the 1838 treaty to constitute what you described as pre-approval of ownership as effectuated in the 1842 treaty, is that right? Yes, but I think there's a threshold question here that your questions, or a point rather, that your questions are illuminating. This is a very fact-intensive inquiry that we are addressing, and the threshold question, our first point of the bar to this claim today that is based on the 1838 treaty should be enough to set this, to have warranted dismissal of the Oneidas complaint in the district court. There are myriad fact questions involved here, and it was precisely the difficulty in assessing those kinds of factual issues that produced Cheryl, and in addition, of course, to the disruption, and in our case, the disruption of this belated claim in the United States. You are making a claim, let me just cut to the chase, you're making a claim of individual ownership in connection with what was a reservation, land that was for the nation, not individuals. The nation, perhaps holding it in trust for individual members of the nation, but it was not individual ownership, and your argument is that, in fact, your client and his family have owned it in an individual capacity, be simple, for generations. Is that right? Yes. That's the bottom, right? And our position is informed by... Usually we require a level of clarity when we talk about Indian reservations, when we talk about treaties affecting the disposition of tribal lands. Is that also right? Yes, clarity is required, and what I find... Very, great clarity. Say again? A great deal of clarity. Yes, but the great deal of clarity, Your Honor, it goes to the question of disestablishment, which is a very different question of whether the United States, in making the 1838 Treaty, specifically promised that individuals could remain on their land without fear of being... If you agree that clarity is required, Mr. Mambrino, then where in the 1838 Treaty does it say that the Orchard Party received title to the land? It is in the narrative described by Justice Ginsburg in the Sherrill case. Where in the Treaty does it say that the Orchard Party received title to the land? What it says in Article 13, Your Honor, which is what we rely on, is that the United States is delegating to the Orchard Party and the Christian Party the authority to make satisfactory arrangements with the governor of New York for the purchase of their lands at Oneida. And in this case, the specific title that is being challenged here is the land that they didn't sell to New York, and New York honored their decision to continue to occupy it from New York's perspective, and the federal government did the same thing. And I say that, it is in the Ransom Gillette commitment in the Treaty discussions that the Senate directed Gillette to clarify with the Oneidas that they could stay on their land forever, if they chose to do so. And so that is the core of the understanding of the Oneidas who stayed behind, and it's the basis for it, and they did. They lived that experience. We're not touting a counterfactual here, making a belated claim. This family has been as they were in 1838. You're relying on Article 13 in the 1838 Treaty, that's the basis, okay. No, I'm also relying on the Treaty conference in which the representations were made contemporaneously, and as a condition to Senate ratification of the Treaty. Plus Treaty conference, okay. Thank you. Of the 1838 Treaty. Yeah, yeah. Thank you. Thank you, Judge Koubranos. Thank you. Judge Menache. Yeah, thanks. So I guess in terms of raising below the question of individual ownership, I guess I did find that in the district court record. Although what you had said in, I guess this is your sure opposition to the motion for judgmental pleadings, was that you obtained, or the defendants obtained their individual interest in the land pursuant to the June 25, 1842 Treaty with New York. But then I guess I understood you just now to be arguing that maybe your entitlement to the land is based in the Sherrill equitable defense, the equitable factors, because you have occupied the land. And then also you said, it's the 1838 Buffalo Creek Treaty, which guaranteed the right to remain on the land. So, I mean, you can have alternative arguments, but I just want to know exactly where you think the right to the land originates. Very helpful. So the 1838 Treaty was the authority that we believe fulfilled the requirement in the Non-Intercourse Act for land to pass from sort of sets out the facts of how that transpired. It wouldn't be enforceable if it didn't have Non-Intercourse Act approval, but we are finding that anticipatory approval, basically the United States saying, you know what, we are concerned only with the land transfer and the removal. We have no quarrel. I get that. I think that's coherent. But the problem is, doesn't that conflict with how we've interpreted Article 13 of the Buffalo Creek Treaty before? So we said that the Buffalo Creek Treaty did not affect the status of the Oneida Indian Reservation. And if in fact, what it had done was approved the transfer of a portion of the reservation to individual ownership, we could not have reached that conclusion. That would have been a limitation on the reservation, right? Well, no, this particular issue, the Article 13 has always been used offensively by the tribe and understandably to protect the integrity of historic reservation. But the provision, the affirmative provisions to benefit those people who were determined to stay, those Oneida people who were determined to stay, is what we are asking this court to examine here. And we've examined that already, right? So we read Article 13 to say, what Article 13 does is it promises that the Oneidas are going to leave New York, but the First Christian Party and the Orchard Party are staying behind so that they can sell their lands to New York, and then they're also going to come. But what we had said was that the 1838 Treaty is really just a promise to make a future promise to sell the lands, but otherwise did not change the character of the reservation or the Oneida Indian Nations entitlement to it. So it does seem that what you're saying is inconsistent with that, because if, in fact, the 1838 Treaty had authorized the Oneidas to take, the Orchard Party to take individual possession, we couldn't possibly have concluded that the 1838 Treaty left the reservation intact. And was only a promise to make a future promise and didn't otherwise change the character to a large extent? And maybe you're right, but we've already considered this question and resolved it a different way. Well, I beg to differ that that's the decision as to Article 13. Article 13 and the Buffalo Creek Treaty, as it's been treated by this court and Sherrill to date, has declined. The courts have declined to conclude about the reservation having been disestablished. And what, so that's in place, but what the reading of the treaty to prevent the Oneida signatories to the 1838 Treaty and to the state treaty that chose to stay behind and were promised the right to do that by the United States will be written entirely out of the treaty. And it's important, this point is important, in our brief we discuss... Wait, why would that be written out of the treaty? So two things. First of all, we said it didn't just not disestablish the reservation, it also didn't diminish it, right? So there weren't any limitations placed on it. And then what we also said was that it just indicates a promise that the two parties, the First Christian Party and the Orchard Party, are going to sell lands to New York State on behalf of the nation. And that, in fact, happened. So we would not be writing that out of the treaty. It happened, but it just didn't happen with respect to this particular parcel. Well, this is why the district court erred in not assessing the facts associated with this matter and granting judgment on the pleadings. There is no understanding in the district court's decision of historic Oneida familial land tenure that we try to set forth in our papers. Had we had a chance at trial to demonstrate this, the logic of these individual family estates, which were organic to Oneida and other New York Indians' land tenure, understanding of land tenure, and fully the Oneida tribal community itself, that would explain why Commissioner Gillette sat down and spoke with the Oneida people and said, you can stay on the land where you reside forever. These were, as Justice Ginsburg carefully pointed out, these were Oneidas. This wasn't the Oneida tribe and it wasn't about retention of Oneida sovereignty. None of those issues are at play. It's only that this family and other families, as is described in the Christian Party treaty that they made with New York, where the land was... Well, so I understand that, but if your argument is that the Oneida tribe transferred the property from overall tribal ownership to familial ownership by the Orchard Party or another faction, and that they held it as a private party and not as tribal lands, that itself would conflict with the Non-Intercourse Act, wouldn't it? Because even tribes need permission in order to transfer tribal lands to private hands. That's the way the Oneidas administered their land, by letting certain families live on certain land, and then they would have to transfer ownership to the family unless they get congressional approval. The Oneidas signed the 1838 treaty. It was the Oneida tribe itself. The signatories included the Christian Party and Orchard Party, and in fact they are listed as the Oneidas, the two sets of signatories. So there was the treaty in general, but the Oneida tribe approved of the special provisions in signing that. Those weren't special provisions set out just for the Orchard and Christian Parties, who were, for this purpose, identical to the Oneida entity that was treating with the United States. But these... Talking about the Orchard Party being a signatory to the treaty, do you regard the Orchard Party as a tribal entity, or at that point, as a family and they're receiving a private ownership of, a private non-tribal ownership of the land? The Orchard Party and Christian Party are descriptors of the two groups, one in Madison County and one in Oneida County, who had the lands that eventually became the subject of these two implementing treaties. The 1842 treaties, one with the Orchard Party and one with the Christian Party. And so the idea... No, there is no suggestion or contention that the Orchard Party became an independent sovereign, or that the Christian Party became an independent sovereign, when, if the facts could be developed in this case, it would be shown that these were all a population of 200 to 300 Oneidas, who decided to remain behind. Their lands were held in the form of familial estates, their individual interests were recognized, and that practice of ownership continued, in the case of Phillips, to the present day. The question is, can this court, in the face of a Sherrill and its own decisions, now approve the dispossession? Let me ask you about Sherrill. So you mentioned that you think that the Sherrill factors, the equitable defense to the claim of ownership by the Oneidas should be in your client's favor. And you said that it should be applied to Indian tenants as well as non-Indian tenants. But Sherrill itself says that it considered certain factors, the long-standing, distinctly non-Indian character of the land and its inhabitants, regulatory authority constantly exercised by New York State and its counties and towns, and the tribe's long delay in seeking judicial relief against parties other than the U.S. So I would accept that, you know, here maybe the tribe took a long delay, although it's not clear because there's no dispute that your client is a member of the tribe, so it's not obvious that, you know, who owned it exactly when he was residing on it. But the other two factors about the long-standing distinctly non-Indian character of the land and regulatory authority exercised by New York State, I mean, it's undisputed here that, you know, your client is a member of the Oneida tribe, so you have a tribal member who's living on or administering the land, and New York State has not exercised regulatory authority over it, right? It has treated it as Indian land, not subject to tax. Well, it is also, right, but it has also done that under its authority. That's not in deference to the United States. New York State, in making its arrangements in the 1842 treaty, had an understanding of about how it was to administer this land. Mr. Phillips would very clearly, on the record, develop, if given the chance, these facts that he lives as a citizen of the state of New York, his mother did the same, and his family before them. They, he has, his membership in the tribe cannot be a basis for expropriating his property. Citizenship doesn't, in any lawful government, cannot have that consequence. Okay. Okay. Thank you very much. Mr. Smith, you're up. May it please the court, good afternoon. Michael Smith for the Oneida Indian Nation. The linchpin of Phillips' position really concerns the 1842 state treaty. He does not argue that the Buffalo Creek Treaty itself transferred any land, and of course it did not. The 1842 state treaty did not vest individual title to the 19.6 acres at issue here in an ancestor of Phillips. Phillips concedes that the land was reserved from Cession to the state. The concession that the land was reserved cannot be reconciled with a claim of individual title to the land. Title to land that's reserved from Cession does not change. That's what it means to reserve the land from Cession. It's undisputed that the 19.6 acres was part of the Oneida Nation reservation, recognized by the United States in the Treaty of Canandaigua as, quote, the property of the Oneida Nation. If the land was reserved from Cession, there was no change to the title in the nation. Analytically, the state did not obtain title if there was no Cession, and if the state did not obtain title, it had no title to convey and no land interest to convey. What Phillips does here, whether he acknowledges it or not, is he would transform the reservation of the land into a Cession of the land to individual Oneida members. That just makes no sense. In the 1842 treaty, if you look at Article I, you'll see that the parties knew perfectly well how to make a Cession. It contains the usual elaborate Cession and conveyance language that you see in these treaties. There's simply nothing in the part of the treaty that deals with the was actually, in some unseen way, a Cession to individual members. The fact that the title was unaffected given that the land was reserved from Cession is reflected also in the provisions of the treaty that provide for it to be collectively held as it was before the execution of the treaty. The Oneida Nation had held its lands collectively since the beginning of time. Prior to the Treaty of Canandaigua, it held those lands collectively under its aboriginal or Indian title. After the Treaty of Canandaigua recognition of its reservation and its property, it also held the land collectively under the treaty. What Phillips, I think, fails to recognize is that collectively is the opposite of individual ownership. Fundamentally, his claims under the 1842 treaty rest on two impossible contradictions that reserved land was actually ceded and the collectively held land is actually individually held. What I think comes through the discussion about a long history of occupation of the land and understanding among members who live there about who will live where is that the argument collapses to the erroneous proposition that tribal members obtained title to tribal land by living on it for a long time. Of course, tribal members live on tribal land. That's what it's for. If residents on tribal land ultimately impaired tribal title, a great deal of the tribal land in this country would disappear. The black letter rule, which I think is completely undisputed in Phillips' brief, is that tribal members do not acquire interest in tribal land by living on it. In Wilson v. Omaha, the Supreme Court said that. The DOI solicit, the Department of the Interior's solicitor opinion in 1934 collects all the authorities of that effect. As far as I'm aware, there is no contrary authority. And the Cohen Indian Law Treatise also reflects the same black letter rule. If that black letter rule is applied here, it simply resolves any suggestion by Phillips that presence on the land impaired the nation's title. In Boylan, I think the court recognized these principles. This court. The court was called on to review an essentially identical 1842 treaty concerning a different tract of Oneida land. The treaty followed the exact same structure. Some land was ceded. Some land was reserved. Some members were going to emigrate to Wisconsin. And some members were going to remain on the reserved land and hold it, quote, in common. The court concluded that this treaty did not give individual land rights to the members who would remain on the reserved land and clearly treated the land as subject to the nation's title. In fact, the jurisdiction in the case and the authority of the United States to sue depended on the tribal title. The United States was clearly enforcing its treaty promises to the Oneida Nation in the Treaty of Canandaigua, and the tribal title was fundamental to the exercise of its authority with respect to Indian tribes. The court held that the land had no individual ownership, and it had to review that issue because one Oneida member named Isaac Conyos had mortgaged a part of the reserved land. There had been a foreclosure. The court ordered the sale of the entire tract of reserved land and used the proceeds to satisfy Conyos' mortgage and to cash out other purported Oneida tribal member individual interests in the reserved land. The court held in holding that there was no individual interest. The court said, quote, no specific lot or parcel was attempted to be allotted or set off by the treaty to any individual Indian as his or her separate share. The court held that there had been no partition of the land under an 1843 statute that purported to authorize partition, and partition is a concept that applies to tribal land. The way tribal land can go into individual ownership is through a partition, but the fact that you're talking about partition puts you in the realm of tribal land, and the court further held, quote, the members have not an undivided interest in tribal lands nor an alienable interest in any particular tract. The court was specifically reviewing in Boylan whether this was tribal land or whether it was individual land, and the holding of the case is that it was tribal, that it was not individual land, which means it was tribal land, and if it were not tribal land, the Honios mortgage would have been valid. I would say that for the same reasons that Isaac Honios mortgage, his recorded mortgage in the land records, was invalid, Phillips' recorded quick claim deed is invalid here. In this record, Phillips clearly was litigating a claim of tribal right and of Orchard Party Oneida right, not a claim of individual or familial right. In his answer in the record at A113, he alleged that the land was held collectively, that's not individually. He alleged that he was, quote, the Orchard Party Oneida member presently occupying the Orchard Party Oneida land. His motion papers are just dominated by allegations of tribal or Orchard Party ownership. He did not litigate a claim of individual ownership in the district court. His argument for tribal ownership or collective ownership was doomed by the concession that he made at page 19 of his opposition to the motion for judgment on the pleadings where he said there is no claim today that the Orchard Party is a separate tribe from plaintiffs Oneida Indian Nation. That means the Orchard Party could not have received any rights under the treaty and could not have succeeded to the Oneida's tribal rights. And of course, the treaty contains no language to indicate that that would occur. The concession that he made was part of the rationale for the district court's ruling that there were no Orchard Party Oneida rights. On He's now defending his position by arguing that there were individual rights. Of course, that's inconsistent with everything he argued in the district court. Excuse me. You have a minute left. The 1838 Treaty of Buffalo Creek really has very little relevance here because it did not transfer land. And the Ransom Gillette promise that we've heard about and that was important in Sherrill was a promise to the nation that its members could remain in New York. Sherrill has no play here because there are really no sovereignty issues here. There's clearly no challenge to a state session. The state agreed in settlement that the nation had sovereignty over this land. And the settlement states as a fact that it was retained by the nation in the 1842 treaty. There are no material facts to litigate in the district court because all material facts offered concern individual ownership or family ownership of land or put differently the the claim that land becomes individual land if it's if it's owned if it's lived on by the tribe. I would tell you in summary that the path to decision is straightforward here because of five key points that are not disputed. One, just federally recognized Oneida Nation land. Two, it was never purchased by or ceded to the state. Three, it remained populated by nation members. Four, it was never taxed. And five, it's recognized today by the state as land reserved by the nation in 1842. Thus the nation holds its unceded title today. The 19.6 acres are not owned by any other nation member or by any other Indian tribe and the judgment should be affirmed. Thank you very much. Any questions? Thank you. Just a few. Mr. Smith, in Cheryl, so there's a little wrinkle, and I believe that it's in Cheryl, where the Supreme Court said that by 1920, the New York Oneidas retained only 32 acres in the state. And I gather that those 32 acres did not include the parcel of land at this in dispute or at issue here, right? Correct. The 32 acres were the boiling land. Right. So, and I understand that you are, you've made the argument that what the Supreme Court said in Justice Kibanis and others have pointed out, and I don't disagree, you know, there's dicta and then there's Supreme Court dicta. What are we to make of what the Supreme Court, or how the Supreme Court described that parcel of land? And don't we, shouldn't we take that more seriously than you indicate we should? Judge, I don't think we're arguing that it's dicta. We're arguing that reference was in a narrative of the factual background of the case. The status of the Marble Hill land, the land at issue here, was not in litigation. It was not being litigated. There was nothing in the record for the court to review to resolve it. It was not in dispute. And the statement that there were 32 acres doesn't come in some part of the opinion where there's a rationale or analysis. It's simply a summary of some of the factual background found in the papers in the case. So they just got it wrong in your view and we should disregard it? No, I wouldn't say they got it wrong. Justice Ginsburg didn't get it wrong. It was not really an issue before to get right or wrong. Okay. Let me ask you just one other quick question. So you ticked off the five issues that offer the narrowest path or a narrow path to affirmance. Do we have to answer the tribal sovereignty or sovereign immunity issue or question? No, I think it's really clear that you don't first. The court decided that. That was in the court's order dismissing the counterclaim. The court dismissed the counterclaim on alternative grounds. One of them is that it was barred by the settlement which was approved by Judge Kahn because Phillips objected to it and then didn't appeal. And also if you look at the settlement that Judge Kahn approved and incorporated into an order of the court, it requires any dispute about the settlement to go back to Judge Kahn. So you don't need to reach the issue because there are alternative grounds. There's a second reason. If the judgment on the pleadings that Phillips does not have an individual, the Orchard Party does not have an interest in this property is correct. There's rights as construed as a matter of law under the 1830, 1842 treaties would resolve any question that could possibly be litigated as to the counterclaim. Okay. Thank you. Judge Manassi. So on that precise question. So if the, if I'm your motion for judgment on the based on your claim that Phillips owns the property, you would have abided by that ruling, right? Yeah. I think it's fair to say we would abide by court rules. We may have appealed it. Right. So then, so, I mean, haven't, doesn't that just mean that the tribe has consented to the district court ruling on this issue? I'm not sure I'm following Judge. The district court rule. So if, so what I'm asking is if it seems to me that Mr. Phillips's counterclaim is the mirror image of your claim, they're both just resolving who owns the property, it all arises from the same transaction. And he's not seeking any kind of relief beyond what the tribe itself is asking for. So, so first of all, why would you object to the court entertaining accounting claim? And second of all, even if you do object, haven't you consented to the district court ruling on that question? On the question of ownership? Yeah. No, Phillips did not litigate a claim of individual ownership. The only issue before the court. No, no, no, no, no. I understand whether you have title to it. Or who has title to this property? I think, I think the point is that the question of who has title stated that broadly and not whether it's an individual or an orchard party claim, that will be resolved squarely on the nation's complaint. The mirror image counterclaim also contains a request for injunctive relief, which is barred by sovereign immunity. And the application of sovereign immunity here, unlike the Upper Skagit case, doesn't affect the ability of the courts to determine the issue that Phillips wants to represent, to litigate. The Oneida Nation has presented the issue of its ownership that Phillips wants to litigate, and in defense of that, and as a counterclaim to it, he asserted collective tribal orchard party ownership. The court resolved that issue. The court resolved that issue as a consequence. I think what you're saying is that everything he's asked me, putting aside the injunction for a second, although probably a declaration as to who owns it would be enough, and we wouldn't necessarily need, whatever, putting aside the injunction for a second, his counterclaim doesn't do anything more, doesn't ask the court to do anything more than you've asked the court to do in deciding proper title to this land, right? I think that's what you just said, that it's just all resolved by your claim. Yes, and as an academic question what the difference is, this process unfolded the way it did because the rules require that the pleadings be closed before you file a motion for judgment on the pleadings. The Nation did not want to have to file an answer in the case at that point and move to dismiss so that it would not have to answer the counterclaim. I just want to focus on the thyroid immunity question. So there's this debate in the briefs about whether there's an exception to sovereign immunity for land claims and so on, but there's also an exception to sovereign immunity when a sovereign sues and somebody has a counterclaim that's just based on the exact same transaction and is within the relief that the sovereign has already asked the court to provide, that there is a waiver of sovereign immunity. You don't contend that Mr. Phillips's counterclaim asks for anything more than you've asked for in filing your claim to be in the first place, do you? It asks for an injunction and affirmative relief against the Nation. Okay, so the injunction is the thing to which you would object. His counterclaim pressed a request for coercive injunctive relief and it's defective because of the sovereign immunity problem, and the presence of sovereign immunity in the case doesn't affect whether the issues that Phillips wants to litigate can be resolved. They were resolved. The issue he wanted to litigate was orchard party ownership. That was resolved, and now he's talking about individual ownership. Right, he's talking about that on appeal, not in the… Correct. It's a fundamental feature of this case and couldn't be more peculiar that he does not allege that the district court's ruling denying orchard party ownership was error, but it was the only issue he put before the district court. Okay, so can I ask another question? So he brought up the Cheryl defense to claim of tribal ownership, and you said that you can't have that defense if you're a member of the tribe. He also has all of these other affirmative defenses like latches and abandonment and so on at common law. In light of the non-intercourse act, are those defenses available? No, but we do not maintain that he can't invoke the Cheryl equitable considerations because he's a member of an Indian tribe. We say he can't do that because there's no challenge to the validity of a state session, no challenge to a chain of state titles, and in fact, no sovereignty issue. The state in the historic settlement with the United Nations recognizes the United Nations sovereignty over this land. That just obliterates the possibility of even a whiff of a Cheryl issue in the case. Okay, so that's the reason, but then can he rely on the common law defenses apart from Cheryl, or is that available or not available to him? Not available and also not nothing was offered that would suggest that any of them could possibly succeed. They all failed as a matter of law, and in fact, in connection with the Cheryl issue, the district court held that Mr. Phillips waived his affirmative defenses of latches and impossibility, and he has not appealed that ruling. Okay, so I have one other question, which is about the 1842 treaty. So you had said that the word collectively in the treaty does a lot of work, but I mean it says that the lands are going to be enjoyed and occupied by the Orchard Party collectively in the same manner and with the same right, title, and interest therein as appertained to them, the parties remaining before the execution of this treaty. So if Mr. Phillips were right that the Buffalo Creek Treaty had established ownership in the Orchard Party, the 1842 treaty just says whatever rights existed before are the rights that will continue to exist. You don't think the 1842 treaty did something different, like change the status quo ante, do you? No, I think it's fundamental to our position that it did not change the status quo ante, but I don't think that Phillips argues that the Buffalo Creek Treaty created individual ownership. His argument is that it envisioned a sale of Oneida land and approved it, and that the 1842 treaty shifted the title. He doesn't claim that the 1838 treaty shifted the title, and Cheryl couldn't be clearer that it did not affect Oneida land rights. Right. So I mean, it does seem like you can read the Buffalo Creek Treaty as saying, on the Oneida thing, we are leaving New York State. And so you might read it to say the factions that are left just get to administer their land, but we have rejected that interpretation, haven't we, as a matter of precedence? Yes, I think you've rejected the interpretation that it affected land rights, and I don't think that it can be read to have suggested that there would be remaining Indians who would have individual ownership. The treaty just did not affect ownership. The execution clause of the treaty and the Ransom Gillette promises are crucial. Ransom Gillette promises the Oneida nation as a nation that nobody had to leave and nobody had to sell, nobody. And the execution clause at the end of the treaty makes it clear that all of the parties of the Oneidas were members of the council house, and as the Oneida tribe of New York agreed to the treaty. In this treaty, the federal government treated with the nation, Kwan Nation, which is, I think, has been conceded in the prior argument. Well, in the prior argument, he did point out that the Orchard Party and the First Christian Party were themselves signatories to the treaty. Does that make a difference? No. All that means, the way the treaty reads in that area is that we, the undersigned chiefs of the Oneida tribe of New York Indians, that's how they're characterized, the chief of the Oneida tribe of New York Indians, consent and so on, after it was explained to our said tribe and council assembled. And then it lists the signatures of the chiefs. But Article 13 does refer to the First Christian Party and the Orchard Party and refers to their lands, which suggests that there are lands particular to those factions. Does that make a difference? Yes, it does. It does, respectfully, of Article 13. And I take a close look at the Sherrill litigation, the briefs, and the decisions will show that. This last clause after the semicolon is awkwardly worded, but it's clear that the they is intended to be the Oneida membership. The references earlier to the parties was just a reference to payment of some funds because of some work done by two parties with respect to immigration to Wisconsin, but the agreement to remove, and I'll tell you, the state and the counties argued this to a fairly well in Sherrill because this was the basis of their disestablishment argument. The agreement to remove, as described in Article 13, concerned the tribe as a whole. But the First Christian Party and the Oneida and the Orchard Party, they did sell different areas of the land to New York State, didn't they? Right. What the state did as time moved along is went to the area of land that it wanted to purchase and dealt with the Indians living there. But that did not affect the existing federally recognized tribal title to lands that were reserved from the session. Okay. All right. Thanks very much. Okay. Mr. Mambrino has reserved two minutes. Thank you, Your Honor. First, it's important to know that the 2013 settlement is a settlement that was not approved by the United States Congress. And the idea is advanced by the Oneida Nation that the state confers sovereignty on the Oneida Nations, whatever lands they may have and identify, without the United States approval. So the idea of a third kind of sovereignty, a federally approved sovereignty, state sovereignty over its own lands, and then the state approved tribal sovereignty is going to have a substantial effect on upsetting settled expectations. Number two, with regard to the Orchard Party land that's at issue here, in 1998, Judge Pooler then in the district court said very clearly that this land that was under Lot 2, which is part of the Marble Hill tract that we're talking about, was not on Oneida territory. Number three, the Boylan case is being misread and misunderstood by the presentation made to you. The lack of subdivision or parceling of that land had to do with a tenancy in common of the land that the United States sued to protect. It was 32 acres of 62 acres of land of one lot of 19. And as to that portion of land, no arrangement had been made to allot that or divide it in severalty among the four families that held it in common. The United States did not secure that land for a tribal title, a tribal title holder. It secured it back to the Indians who held it in common, which was less than the entire Christian party. It's, I think, a serious misunderstanding of the case. Third, or my next point, is that the idea of the Sherrill decision and this court's decision not seeing this as an ancient claim being belatedly made to them. Phillips does not consider himself under the sovereignty or jurisdiction of the Oneida nation. And by the same token, if you look at the 2013 settlement, there are at least three non-Indian homes on lot three that would be under the Oneida tribe's interpretation of the 2013 settlement, would make them, these existing non-Indian landholders, subject to Oneida jurisdiction as far as New York state is concerned. That's a serious disruption of settled expectations, I would suggest to the court. Let me just see my last... So, oh, the other, the final point I would make, Your Honors, is that the 32 acres is now in trust. As part of an 18,000 acre holding by the Oneida nation. In all, there was no real tribal presence, no identified tribal presence in the record from 1838 until about the 1970s when the land claims were inaugurated, principally by the Wisconsin Oneidas. In all the years where there was a resurgent Oneida tribal presence here, not once, not in any case, has the Oneida tribe looked at Melvin Phillips' land and said, this is ours, it's not yours. And finally, a quiet title action requires at least actual or constructive possession. And we believe the facts will demonstrate, if given an opportunity to do that, that there is no constructive possession and there is clearly no actual possession because that was their claim that they should have possession. But the shortest answer to this dispute is to apply your repeated decisions about ancient claims against New York landholders to this case. Melvin Phillips is living like a New York citizen and his membership should not result in the expropriation of his land. There are other ways. If they wanted to purchase his land, they could do it. They've never approached him. This is a severe abuse of his private property rights. So we urge the court to consider these arguments and urge that the district court be reversed. Thank you very much, Mr. Mebrino. We'll reserve the decision. Are there any questions? Do any members have any questions? No, thank you. Okay. All right. So we'll reserve the decision in Oneida Indian Nation against Phillips and we will adjourn. Court is adjourned.